UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Wentworth-Douglass Hospital,
        Plaintiff

        v.                                    Case No. 10-cv-120-SM
                                              Opinion No. 2012 DNH 057
Young & Novis Professional
Association d/b/a Piscataqua
Pathology Associates; Cheryl C.
Moore, M.D.; Glenn H. Littell,
M.D.; and Thomas Moore, M.D.,
        Defendants


**O R D E R**


Wentworth-Douglass Hospital ("WDH" or "the hospital")
brought suit against several physicians and a professional
association, under the Computer Fraud and Abuse Act, 18 U.S.C.
§ 1030 (Counts I-III) and under New Hampshire statutory and
common law (Counts IV-V).  The hospital says it declined to renew
defendants' contract to provide pathology services, whereupon
defendants misappropriated and erased important computer data
belonging to the hospital.  Defendants, in turn, assert
counterclaims against the hospital for invasion of privacy (false
light), defamation, misappropriation of trade secrets, and
conversion.  Defendant Moore says, among other things, that the
hospital portrayed her in a false light by publically, and
falsely, stating that the College of American Pathologists placed
the hospital's pathology laboratory on probation because she, as

Laboratory Director, failed to provide proper oversight.   Three defendants claim the hospital defamed them when, in a public statement, its spokeswoman characterized electronic data in the possession of Drs. Moore and Littell (later returned to the hospital) as having been "stolen" from the hospital.

Before the court are the parties' motions for summary judgment, document nos. 79, 81, and 84.

## Standard of Review

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).   Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

**Background**

Most of the relevant facts in this case are set out in this court's prior orders (document nos. 33 and 54), and need not be recounted in detail here.  Additional or specific facts relevant to the disposition of the parties' motions for summary judgment are discussed as appropriate.

**Discussion**

The hospital moves for summary judgment on Counts I through IV of its amended complaint, and on defendants' third and fourth counterclaims, primarily on grounds that the hospital's IM-09 policy both governed defendants' conduct and established or confirmed the hospital's ownership rights in certain documents and data.  Defendants cross-move for summary judgment on all the hospital's claims (Counts I through V), asserting primarily that, regardless of any factual dispute over the applicability of the IM-09 policy, federal privacy laws required them to remove or delete data from the lab computers.

The hospital also moves for summary judgment on defendants' counterclaims for invasion of privacy and defamation (first and second counterclaims).  It seeks a judicial determination that Drs. Moore and Littell are limited-purpose public figures who cannot establish that the hospital acted with malice.

**Claims Related to Computer Access and Data**

A.   *Plaintiff's Motion for Summary Judgment as to Count I*

In Count I, the hospital alleges defendants violated § 1030(a)(2)(c) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(c), when they attached a removable storage device to the pathology lab's computers and copied, downloaded, and deleted data.  Section 1030(a)(2)(c) provides a private right of action to any person who suffers damage or loss when another "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."  Id.

The hospital thinks it undisputed that the restrictions described in its IM-09 policy governed the defendants' access to, and use of, hospital computers, and that defendants' conduct plainly exceeded those limitations.  But defendants counter, in part, that a material factual dispute exists as to whether the IM-09 policy applied to them.

Defendants' point is well taken.  Even assuming, as the hospital contends, that defendants were typically governed by IM-09, a factual question remains as to whether the hospital's Senior Vice President of Operations, Daniel Dunn, waived or modified the policy or otherwise agreed to different restrictions

4

during the closing-out of the Young & Novis pathology lab (i.e., during the "Transition").  The relevant evidence consists of the parties' recollections of face-to-face meetings between defendants and Dunn; Dunn's follow-up letters; and contradictory deposition testimony as to what the parties, at the time, understood Dunn to have authorized.[1]  Although the contradictory evidence may be thin, it is sufficient to give rise to reasonable inferences in support of defendants' theory, thereby creating a trial worthy issue.[2]

Accordingly, the hospital's motion for summary judgment with respect to Count I is denied.

_____

[1]   To the extent a factual dispute exists as to whether Dr. Thomas Moore acted as an agent of Young & Novis, and not simply as a physician with hospital privileges, the motion is denied as to him also.

[2]   Because a factual dispute precludes summary judgment in the hospital's favor on Count I, the court does not reach defendants' legal argument that "exceeds authorized access" requires the hospital to prove a breach of fiduciary duty when a use restriction is violated.

Importantly, both parties ask this court to accept the ruling in United States v. Nosal, 642 F.3d 781 (9th Cir. 2011), but they do not directly, and fully, engage the central issue in that case, i.e., whether violating a "use" restriction can ever constitute "exceeding authorized access."  Moreover, after the parties submitted their briefs to this court, the Ninth Circuit agreed to rehear Nosal en banc.  See United States v. Nosal, 661 F.3d 1180 (9th Cir. 2011).  Therefore, the court does not at this time address the meaning of "exceeds authorized access" in the context of use restrictions contained in the IM-09 policy.

B.    _Plaintiff's Motion for Summary Judgment on Counts II, III,_
      _and IV_

      Under the hospital's theory of the case, Counts II, III, and

IV, like Count I, are premised on alleged conduct by the

defendants that violated the hospital's IM-09 policy - a policy

that establishes computer access and use rules, and defines

property rights in data and computerized databases.  In Count II,

brought under Section 1030(a)(5)(A) of CFAA, the hospital alleges

that defendants damaged its computers and networks when they

"violated IM-09" (document no. 81-1, at 16) by installing

DriveScrubber 3 software and/or issuing commands that deleted

information from the C Drives of three pathology lab computers as

well as the H, K, and P Drives of the hospital's computer

network.  See 18 U.S.C. § 1030(a)(5)(A) (providing cause of

action against a person who "knowingly causes the transmission of

a program, information, code, or command, and as a result of such

conduct, intentionally causes damage without authorization, to a

protected computer.").  In Count III, the hospital alleges that

defendants conspired to commit the wrongful acts alleged in Count

II, as well as in Count I.  See 18 U.S.C. § 1030(b).  Count IV

alleges that defendants committed the common law tort of

conversion by exercising intentional "dominion or control"

(document no. 81-1, at 25), over computer data that, under the

IM-09 policy, belonged to the hospital.  See Kingston 1686 House,

Inc. v. B.S.P. Transp., Inc., 121 N.H. 93, 95 (1981) ("Conversion

is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.") (quotation omitted).

As discussed, a factual dispute exists with respect to whether the IM-09 policy applied to defendants as written, or whether, during the Transition, Dunn authorized them to exercise control over certain data or documents without assistance from the hospital or its IT department.  It cannot be said, as a matter of law, then, (1) that damage caused by defendants, if any, to the hospital's computers was intentional or without authorization (Count II); (2) that defendants conspired to commit the wrongful acts alleged in Counts I and II (Count III); or (3) that defendants intentionally exercised dominion or control over hospital property, as described in the IM-09 policy.  Summary judgment on Counts II-IV is also precluded by the existence of a material factual dispute regarding whether Dr. Littell deleted hospital data from the network drives.[3]

---

[3]     For example, there is evidence that someone intentionally wiped clean the network K drive, and evidence which raises an inference that Dr. Littell was that person.  But Dr. Littell states in his affidavit that he did not delete all data from the K drive.  Document No. 98-3, pars. 18, 19, 20.  His averment is not necessarily inconsistent with his earlier deposition testimony that he could not recall whether he had deleted network data, or with his interrogatory answer that he did not "permanently delete[…] any electronic data from the WDH computer

For these reasons, the hospital is not entitled to summary judgment on Counts II, III, and IV.

C.   _Defendants' Motion for Summary Judgment on Counts I, II, III, and IV_

Defendants move for summary judgment on Counts I, II, III, and IV, on two broad grounds.  They first contend that documents removed from the computers "belonged to them" under both the common law and their agreement with the hospital.  That may be so, but relevant material facts are genuinely disputed - specifically, whether the IM-09 policy or some modified version of it applied to defendants during the Transition.

Defendants argue, in the alternative, that, regardless of any factual dispute as to private agreements or policies governing their behavior, "they were obliged to maintain" the documents under state law and federal privacy law.  Document No. 84-1, at 2.  Whether state corporation laws required defendants to remove documents depends on resolution of material factual issues, such as the character of documents actually deleted or removed.  Similarly, whether federal HIPAA regulations, 45 C.F.R.

---

network."  Document No. 94-25, par. 6.

The hospital has marshaled considerable circumstantial evidence tending to contradict Dr. Littell's averment.  But whether Dr. Littell's contradictory testimony is worthy of belief is a matter for the jury.

§ 164.310, required defendants to download and delete particular
computer files turns, in part, on whether the IM-09 policy
applied to them.  As the hospital argues, the IM-09 policy, if
applicable, may have served to satisfy the regulation's
requirements by vesting responsibility for the "final disposition
of electronic protected health information" or "media re-use," 45
C.F.R. § 164.310 (d)(1),(2), in its own Security Officer, Jeff
Pollack (and not in individual users such as Drs. Moore and
Littell).  Because applicability of the IM-09 policy to
defendants during the Transition period is genuinely disputed, it
cannot be said, as a matter of federal privacy law, that
defendants were legally obligated to delete data.


       For these reasons, defendants are not entitled to summary
judgment in their favor on Counts I, II, III, and IV.


D.   _Defendants' Motion for Summary Judgment as to Count V_

       The hospital alleges in Count V that defendants committed
unfair and deceptive trade practices, in violation of N.H. Rev.
Stat. Ann. ("RSA") ch. 358-A, by "scrubbing and removing patient
data" in order to "thwart the efforts of [the hospital] to
provide pathology services to [hospital] patients."  Document No.
94-1, at 39.  Defendants say they are entitled to summary
judgment on Count V because the actions allegedly taken by them,

even if assumed to be true, do not meet the "rascality" test of State v. Sideris, 157 N.H. 258, 263 (2008).  Document No. 84-1, at 30.


New Hampshire's Consumer Protection Act makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  RSA 358-A:2.  The Act describes several specific business practices falling within its scope, see id., and reaches any other unfair or deceptive practice that "attain[s] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Barrows v. Boles, 141 N.H. 382, 390 (1996) (quotation omitted). See also Tagliente v. Himmer, 949 F.2d 1, 7 (1st Cir. 1991) (applying "rascality" test).


The CPA is applicable to transactions "involving ultimate consumers," and may be applied to business-to-business transactions.  E. Mountain Platform Tennis, Inc. v. Sherwinn-Williams Co., 40 F.3d 492, 497 (1st Cir. 1994).  The context of a business-to-business transaction is relevant to the rascality inquiry - for what is "rascality" in a transaction between a seller and an ultimate consumer may be nothing more than "rough and tumble" where two businesses are involved.  See Knapp Shoes,

Inc. v. Sylvania Shoe Mfg. Corp., 72 F.3d 190, 200 (1st Cir. 1995) (stating, it is "especially difficult" to show rascality "where the case involves arms-length transactions between sophisticated business entities," in applying Massachusetts consumer protection law); Cf. Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (CPA is concerned with "equaliz[ing]" the positions of transacting parties and the fact that "both stand on equal footing" is relevant to the Act's application) (quotations omitted).

In the "rough and tumble" business world in which the hospital operates, disputes over electronic data ownership, possession, copying, and deletion that arise during the break-up of long-term contractual relationships among professional service providers are probably to be expected, and ordinarily will not rise to a level sufficient to support a claim under the Act. That numerous other statutory and common law remedies are readily available to aggrieved parties in such circumstances also tends to confirm the ordinary nature of these disputes. See Yorgo Foods, Inc. v. Orics Indus., Inc., No. 08-cv-438-SM, 2011 WL 4549392, at *13 (D.N.H. Sept. 29, 2011) (defendant's conduct was "not unknown in the rough and tumble of the world of commerce" and "a ready remedy" for it was available under the Uniform Commercial Code).

The record, as developed, bears that out.  Even accepting the hospital's weak, inferential evidence that defendants deleted data for improper purposes, the nature of the conduct <u>in context</u> does not rise to a sufficient level of rascality.  It is reasonably clear on this record that the parties' contradictory claims (then and now) to ownership and possession of the data are fairly colorable.  Indeed, the facts related to contractual rights and understandings are genuinely disputed.  Even if defendants can be said to have acted improperly, their conduct appears to be arguably consistent with their colorable claims to ownership and possession of data.  Someone inured to the "rough and tumble" of the world of business - here hospital administration - would likely see this dispute and the parties' data-related conduct as the unsurprising product of a deteriorating professional relationship.

Accordingly, because defendants' conduct, as alleged, does not rise to the level of rascality necessary to support a cause of action under New Hampshire's Consumer Protection Act, defendants' motion for summary judgment on the hospital's Consumer Protection Act claim, Count V, is granted.

12

E.   _Plaintiff's Motion as to the Third Counterclaim: Trade
     Secrets Misappropriation_

In their Third Counterclaim, defendants allege that the

hospital violated New Hampshire's Uniform Trade Secrets Act

("NHUTSA"), RSA 350:B, by misappropriating Young & Novis' trade

secrets contained in the so-called "Gross Boilerplate" document.

The hospital moves for summary judgment.


New Hampshire's trade secret law defines a "trade secret"

as:

> IV. . . . information, including a formula, pattern,
> compilation, program, device, method, technique, or
> process, that:
>
> (a) Derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other
> persons who can obtain economic value from its
> disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under
> the circumstances to maintain its secrecy.

RSA 350-B:1.


In its motion, the hospital argues that the Gross

Boilerplate document does not meet the last part of the statutory

definition of "trade secret."[4]  That is, it contends that the

---

[4]   The hospital does not argue that the Gross Boilerplate
document fails to meet the first parts of the statutory
definition of a trade secret.  No facts, therefore, have been
brought to the court's attention that would suggest that the

facts are not genuinely disputed as to what steps defendants took
to protect the secrecy of the document and that those steps were
not reasonable.

While disputes about the efforts undertaken by defendants
are only minor ones, still, whether those efforts were
"reasonable" must be resolved by the jury, since "what is
reasonable is itself a fact for purposes of Rule 56 of the civil
rules." Rockwell Graphic Sys., Inc. v. DEV Indus., 925 F.2d 174,
180 (7th Cir. 1991) (Posner, J.) (reversing grant of summary
judgment in misappropriation of trade secrets case because
question of reasonable precautions to protect trade secrets is
question for the jury; "only in an extreme case can what is a
'reasonable' precaution be determined on a motion for summary
judgment, because the answer depends on a balancing of costs and

---

document qualifies as "information . . . that derives independent
economic value . . . from not being generally known . . . [or]
readily ascertainable by proper means." RSA 350-B:1. To the
contrary, on the limited facts presented, there is some doubt
that a "compilation of language [and] templates," doc. no. 98-2,
par. 32, specific to the pathology lab industry would so qualify.
See e.g. Chornyak & Assoc.,Ltd. v. Nadler, No. 08AP-380, 2008 WL
5266056, at **7-10) (Ohio App. Dec. 18, 2008) (accountant's
"Excel templates" were not trade secrets because they did not
have independent economic value; they were "very basic and
unsophisticated" and were similar to what was used "routinely" by
others in the industry, such that they would not "provide anyone
in possession of them with a competitive advantage over
others."). See generally, Agency Solutions.Com, LLC v. The
Trizetto Group, No. CV F 11-1014 AWI GSA, 2011 WL 4084702, at
**11-19 (E.D. Ca. Sept. 13, 2011).

benefits that will vary from case to case."). <u>See also</u> <u>Niemi v.</u>
<u>NKH Spring Co., Ltd.</u>, 543 F.3d 294, 303 (6th Cir. 2008)
(reversing grant of summary judgment on claim for
misappropriation of trade secrets because "the reasonableness of
[plaintiff's] efforts is a question for the trier of fact"). <u>See</u>
<u>also</u> <u>generally</u> <u>Mortgage Specialists, Inc. v. Davey</u>, 153 N.H. 764,
771 (2006) (existence of trade secret is a factual issue for the
jury).

        The hospital also argues that it is entitled to summary
judgment on defendants' trade secrets claim because the evidence
does not establish that it <u>acquired</u> the Gross Boilerplates
document through "improper means."  But under NHUTSA, a claim for
trade secret misappropriation may also be premised on the
defendant's disclosure of a trade secret in violation of a duty
of secrecy.  <u>See</u> RSA 350-B:1, II (b)(2); <u>OneSky Litigation Trust</u>
<u>v. Sullivan</u>, Civ. No. 10-cv-344-LM, 2012 WL 124739, at *3 (D.N.H.
Jan. 17, 2012); <u>Forrester Env't Services v. Wheelabrator Tech,</u>
<u>Inc.</u>, Civ. No. 10-cv-154-JL, 2011 WL 6300536, at *12 (D.N.H. Dec.
16, 2011) (misappropriation occurs by improper "acquisition,
disclosure, or use.").  The counterclaim here alleges that,
"[u]nder the Agreement [with the hospital], these Defendants had
a reasonable expectation that competitors would not access or be
allowed access to their intellectual property." <u>See</u> Third

Counterclaim, document no. 73, at 11-12.  There is evidence that
the hospital allowed the successor pathology group (a Young &
Novis competitor) access to the document.  Because the hospital
did not address that cognizable theory of misappropriation in its
motion, it has not shown, as a matter of law, that it is entitled
to summary judgment on the trade secrets claim.[5]

In its final argument, the hospital contends that there is
no evidence that defendants suffered any damage as a result of
the alleged misappropriation.  But, defendants also assert an
implicit claim for equitable relief under RSA 350-B:2, barring
the hospital's continued use or disclosure of the Gross
Boilerplates document (arising from their prayer for the "return"
of their property and for "further relief as may be just and
equitable") which entitles them to proceed to trial.  The
hospital is free, of course, to challenge the sufficiency of the
damages evidence at appropriate junctures during trial.

Accordingly, the hospitals's motion for summary judgment on
the Third Counterclaim is denied.

---

[5]     Even if the hospital had addressed defendants' theory of
misappropriation, the applicability of the IM-09 policy and/or
the Agreement, and the parties' respective property rights and
mutual obligations under those documents, turn on genuinely
disputed material facts.

F.   *Plaintiff's Motion as to the Fourth Counterclaim: Conversion*

The hospital moves for summary judgment on defendants' Fourth Counterclaim for common law conversion.  It contends that the IM-09 policy determined the property rights of the parties. As noted, there is a material factual dispute about the applicability of the IM-09 policy before and during the Transition.  The motion is, therefore, denied.

**False Light and Defamation Claims**

A.   *Plaintiff's Motion as to First Counterclaim: False Light*

To prevail on her false light claim, Dr. Moore must show that the hospital placed her in a "highly offensive" false light, and that it "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which [Moore] would be placed."  2/4/11 Order, document no. 54, at 15.  The hospital argues that, even if the jury were to find that its February 2010 statements implied that deficiencies in Dr. Moore's oversight of the lab led to the CAP probation, such an implication would not be false.  Moreover, says the hospital, even if such an implication were false, Dr. Moore is a limited-purpose public figure who must, but has failed to, show by clear and convincing proof that the hospital acted with actual malice. See Howard v. Antilla, 294 F.3d 244, 248-49 (1st Cir. 2002).

17

1.    Falsity of the Implication

In its earlier ruling, <u>see</u> document no. 54 at 13, this court held that a reasonable person could understand the hospital's statements as implying that CAP placed the lab on probation <u>because</u> of deficiencies on the part of Dr. Moore.  The hospital now argues that the record shows that such an implication, if made, was not false.  As this court noted in its earlier decision, the CAP letter did not "directly ascribe blame."  <u>Id</u>. at 17.  The facts, as now developed, and viewed in the light most favorable to Dr. Moore, may suggest why: at the time of the probation decision, CAP had not undertaken to determine who was at fault for the perceived oversight deficiencies.  <u>Foster's Daily Democrat</u> newspaper ("<u>Foster's</u>") reported that a CAP representative "said CAP didn't wait to place the lab on probation until determining whether Dr. Cheryl Moore's authority was undermined, as she claims, because an investigation revealed enough concern to warrant a closer review of pathology lab operations."  Document No. 79-2.  Moreover, when asked by the hospital to confirm Dr. Moore's "specific deficiencies," CAP declined to provide confirmation.  Biehl Tr., document no. 97-10, at 116-120.

In addition, defendants have adduced sufficient evidence to create a material factual dispute as to whether the hospital

contributed to CAP's concern that laboratory oversight was
deficient.  For example, a jury could find that, by responding
separately to the CAP complaint, the hospital acted as a separate
authority over the lab's operations, thereby undermining Dr.
Moore's oversight, and at the same time confirming its
interference.  Although Dr. Moore testified that it was
"reasonable for [WDH] to want to participate in the response,"
document no. 79-9, she avers in her affidavit that it is "highly
irregular" for hospital administrators and their attorneys to
respond to CAP inquiries, "as it would normally be the
responsibility of the Laboratory's Medical Director."  C. Moore
Aff., document no. 97-5, par. 21.  She also states that Dunn
"undertook responsibilities within my authority as the Medical
Director of the Laboratory" when he wrote to CAP, requesting that
all CAP inquiries be directed to him.  Id. at par. 24.  Dr.
Moore's concession and averments are not contradictory.
Moreover, that CAP accepted and considered the hospital's
responses to its inquiries does not necessarily mean that CAP did
not view the manner of those responses as indicating hospital
interference in the exercise of Dr. Moore's authority over the
pathology lab.  Finally, evidence that the hospital's decision to
respond separately to the CAP complaint did not amount to an
attempt to undermine Dr. Moore's authority, but was an effort to
"prevent" CAP from placing the lab on probation, only illustrates

19

the factual dispute.  The hospital says that it intervened because it felt Dr. Moore had a conflict of interest that might prompt her to answer CAP's questions in a way that would result in probation.  When viewed in the light most favorable to Dr. Moore, the hospital's explanation tends to support her claim that the hospital deliberately circumvented her authority during the course of an investigatory process in which the hospital would normally defer to the laboratory's medical director.

For these reasons, on this record, a reasonable jury could find that the statement implying that CAP's probation decision was based on deficiencies in oversight by Dr. Moore was a false statement.

2.   Knowledge of Falsity or Reckless Disregard

Liability for false light invasion of privacy may turn on whether the injured party is a public or private figure.  See Howard, 294 F.3d at 248-49 (citing Time, Inc. v. Hill, 385 U.S. 374, 390-91 (1967)).  Where the injured party is a public figure, that party must prove by clear and convincing evidence "that the offending statement was made with 'actual malice' - that is, that the false statement was made intentionally or with reckless disregard as to whether it was false."  Id. at 249.

There are two types of public figures: those who are public
figures for all purposes and those who are limited-purpose public
figures.  <u>Gertz v. Robert Welsh, Inc.</u>, 418 U.S. 323, 351-52
(1974).  Limited-purpose public figures are those who "have
thrust themselves to the forefront of particular public
controversies in order to influence the resolution of the issues
involved."  <u>Id</u>. at 345.  In determining whether an individual is
a limited-purpose public figure, the court must look "to the
nature and extent of [her] participation in the particular
controversy," <u>id</u>. at 352, and evaluate whether she has
"voluntarily exposed [herself] to increased risk of injury from
. . . falsehood concerning [her]."  <u>Id</u>. at 345.

Here, the hospital says that Dr. Moore thrust herself to the
forefront of the CAP controversy, and, by doing so, voluntarily
assumed the risk of injury from public statements that might
place her in a false light with respect to that controversy.

As an initial matter, the hospital identifies the relevant
public concern or controversy as the patient privacy breach and
its purported retaliation against defendants (including non-
renewal of the lab contract) for their criticism of the
hospital's handling of that breach.  There is no question that
this "breach-retaliation" controversy was of significant public

concern.  Moreover, it is not seriously disputed that the CAP
complaint was a significant part of that broader controversy.
The CAP complaint alleged problems with the pathology lab
relating to the patient privacy breach, including "inappropriate
access to patient's health information" and "unauthorized and
inappropriate modification of patient data files."  Document No.
79-16.  The real point of contention is not the status of those
controversies as "public concerns," but whether Dr. Moore placed
herself at the forefront of the CAP controversy prior to the
hospital's February statements about CAP's probation decision and
Dr. Moore's "deficiencies."

      It appears to be undisputed that Dr. Moore's husband, and
not Dr. Moore, filed the CAP complaint.  In addition, Dr. Moore
says that at the time CAP contacted her in mid-November of 2009
about its investigation, she was "unaware of the source of the
complaint."  C. Moore. Aff., Document No. 97-5, par. 17.
Nevertheless, the hospital contends that Dr. Moore publically and
voluntarily placed herself at the forefront of the CAP
controversy by using the fact of the CAP complaint to bolster her
position in her public communications about the breach-
retaliation dispute.  The hospital relies primarily on Dr.
Moore's concession that she and Littell told Foster's reporters
at their November 2009 meeting that complaints about the privacy

breach had been filed with several governmental and professional agencies, including CAP.  The court cannot say, as a matter of law, that by this single act, Dr. Moore assumed the risk of being placed in a false light regarding her role in CAP's eventual resolution of the complaint.  See Gertz, 418 U.S. at 344-45.

Dr. Moore's status as a limited public figure with respect to the CAP complaint remains an open question.  A factual dispute exists with respect to the nature and extent of Dr. Moore's participation in the public dispute about the CAP complaint. After her initial meeting with reporters in November - but before the hospital's February 2010 statements about her "deficiencies" - Dr. Moore acted in ways that a jury may find amounted to continued participation in the growing public debate about the CAP controversy.  For instance, after November, Dr. Moore continued to grant media interviews about the breach-retaliation dispute.  She was interviewed for articles that appeared on December 4, December 23, and January 27.  Dr. Moore's (arguably) extensive engagement with the press during that time coincided with publication of numerous articles and editorials that continued to link the CAP complaint with Dr. Moore's breach-retaliation dispute with the hospital.  Resolution of competing inferences about the extent to which Dr. Moore induced or encouraged growing media attention to the CAP controversy is

23

likely for the jury to decide.  Accordingly, the court cannot
conclude on this record, and as a matter of law, that Dr. Moore
was a limited public figure for purposes of the CAP complaint and
related controversy.

Even assuming, however, that Dr. Moore was a limited-purpose
public figure, who must establish actual malice by clear and
convincing proof, there is sufficient evidence from which a jury
could make such a finding.  Viewed in a light most favorable to
Dr. Moore, the evidence suggests that the hospital published its
statements about Dr. Moore without having made basic inquiries
(including of CAP)[6] into their truth or falsity; that it was
motivated to "craft" a public communication that blamed Dr.
Moore; and that it knew it had contributed to CAP's decision to
place the lab on probation.  See Schatz v. Republican State
Leadership Committee, 669 F.3d 50, 58 (1st Cir. 2012)
("[R]ecklessness amounting to actual malice may be found where
the defendant deliberately ignores evidence that calls into
question his published statements.") (quotation omitted); Gray v.
St. Martin's Press, Inc., 221 F.3d 243, 251 (1st Cir. 2000)

---

[6]   The hospital concedes that it was only "after the
publication of the February 17, 2010 article" that it had a
telephone conversation with a CAP representative regarding the
bases for the CAP probation decision.  Document No. 110, at 8 n.3
(emphasis in original).  That call revealed that CAP was
unwilling to cite any specific deficiencies on Dr. Moore's part.

(stating that "refusing to seek out decisive witnesses may be a mark of recklessness in some circumstances," but finding no actual malice because defendant had consulted "multiple sources."); <u>Ford v. Warner-Lambert Co.</u>, Civ. A. No. 86-0770-C, 1987 WL 9905, at *4 (D. Mass. April 8, 1987) (in libel action, factual dispute existed as to employer's actual malice where there was some, although "thin," evidence that he "had a motive to fabricate.").

For these reasons, plaintiffs' motion for summary judgment as to the First Counterclaim is denied.

B.   <u>*Plaintiff's Motion as to Second Counterclaim: Defamation*</u>

In their second counterclaim, defendants allege that the hospital defamed them when its spokesperson, Noreen Biehl, told a <u>Foster's</u> reporter that defendants "stole" WDH data on the last day of the Transition.  The hospital contends, primarily, that defendants were limited-purpose public figures who cannot establish that the hospital acted with actual malice.

Defendants respond that they were not public figures because the controversy over the missing data was and remains a private contractual dispute and does not rise to the level of public concern.  As noted earlier, however, defendants themselves

25

publically linked the parties' troubled business relationship with the patient privacy breach, and there appears to be no clear division between the events giving rise to the data dispute and the hospital's alleged retaliation.

Defendants did thrust themselves to the forefront of the breach-retaliation dispute.  As noted, Dr. Moore spoke with reporters on several occasions regarding that controversy.  Dr. Littell's voluntary communications with the media were even more extensive.  From November of 2009 through mid-February of 2010, Dr. Littell engaged in 41 e-mail exchanges with a <u>Foster's</u> reporter who was covering the breach-retaliation story, and went to seemingly great lengths to gather information to forward to the reporter.  Dr. Moore testified that the purpose of their media communications was to "get the story out" about patient safety, certainly a matter of public concern.  Dr. Littell likewise testified that he "felt the public had a right to know about patient safety and patient privacy issues."  Document No. 79-10.

For these reasons, Dr. Moore and Dr. Littell were limited public figures for purposes of the breach-retaliation dispute, a dispute which included the events on the last day of the Transition relating to data copying and deletion.

The hospital, however, is not entitled to summary judgment on the defamation claim.  First, a jury could reasonably find by clear and convincing evidence that the hospital acted with actual malice when its spokesperson (purportedly) told a _Foster's_ reporter that defendants had "stolen" hospital data.  Viewing the facts of record, and indulging all reasonable inferences, in defendants' favor, a rational jury could find that the hospital had a vested interest in, and pursued a public relations campaign to, discredit defendants publically.  Moreover, the high degree of hostility between the parties, beginning as early as mid-2009, is undisputed.  While summary disposition may sometimes be appropriate on the issue of actual malice, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), still, "proof of 'actual malice' calls a defendant's state of mind into question . . . and does not readily lend itself to summary disposition." Hutchinson v. Proxmire, 443 U.S. 111, 120 n.9 (1979).

Second, a material factual dispute exists as to whether, in the reporter's words, Biehl "described [the data] as being stolen from the hospital."  Document No. 79-2.  Biehl has denied that she did.  But, the evidence also shows that Biehl did not, in this instance, follow her usual practice of asking the newspaper to correct the alleged misstatement.  Defendants have produced a minimally sufficient record to support their allegation that

27

Biehl made the statement, and they are entitled to have a jury determine Biehl's credibility.

Accordingly, defendants are not entitled to summary judgment on defendants' defamation claim.

### Conclusion

For the reasons given, defendants' motion for summary judgment (document no. 84) is granted in part (as to Count V), and denied in part (as to all other counts). Plaintiff's motions for summary judgment (document nos. 79 and 81) are denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 30, 2012

cc:  William E. Christie, Esq.
     Charles W. Grau, Esq.

28